UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JACK DAVID GETZ, <br><br>　　　　　　　Petitioner,<br>v.<br><br>JACK PALMER, et al.,<br><br>　　　　　　　Respondents. | Case No. 3:06-cv-00320-MMD-VPC<br><br>ORDER |

Before the Court for a decision on the merits is an application for a writ of habeas corpus filed by Jack David Getz, a Nevada prisoner. (Dkt. no. 68.)

I. **FACTUAL AND PROCEDURAL HISTORY**

This case stems from the December 25, 1997, shooting death of Rayburn Ware. The Nevada Supreme Court recounted some of the facts of the case as follows:

> . . . [A]ccording to Getz's own testimony, he shot Ray. Although Getz claimed that the shooting was in self-defense, testimony at his trial showed otherwise. Testimony showed that Getz had previously made statements threatening to kill Ray and his friends, as well that he was unhappy that his daughter was dating Ray, who was the likely father of her unborn child. Testimony also showed that Getz had owned and received training on how to use handguns; whereas Ray who was afraid of guns, had never been seen with one.
>
> Moreover, expert testimony showed that Ray was brutally shot four times at close range. These shots included one to the top of the head, one to the neck/chin, and two in the shoulder while he [Ray] was on the ground. This shooting occurred while Ray was outside a parking lot late on a particularly cold Christmas night without a coat.
>
> We find the following testimony particularly relevant: Getz was out driving late on Christmas night for no logical reason; Getz and his family were planning to move out of state within a number of days; even though Getz was a trained private detective, he did not immediately report the

> shooting to police or call 9-1-1 for help; instead, Getz drove home to change his clothes and then drove from Las Vegas to Arizona to dispose of the bloody clothes he wore during the shooting; according to Getz, he just left the gun and Ray's body lying on the parking lot; the gun was never found; and Getz was not entirely forthcoming to police about the night's events.

Dkt. no. 32-4, p. 4-5.

In March 1998, an indictment was filed charging Getz with one count of murder with use of a deadly weapon. In pretrial proceedings, Getz waived a separate penalty hearing before the jury should he be found guilty. The case proceeded to trial, which occurred February 9, 2000, through February 14, 2000. The jury found Getz guilty of first degree murder with use of a deadly weapon. On April 27, 2000, a judgment of conviction was entered. Getz was sentenced to two consecutive terms of life without the possibility of parole.

On May 8, 2000, Getz filed a direct appeal of his conviction. On March 13, 2002, the Nevada Supreme Court filed an order of affirmance. On March 13, 2003, Getz filed his state post-conviction petition for a writ of habeas corpus. The district court held an evidentiary hearing. On June 23, 2004, the district court filed a written order dismissing the state habeas petition. Getz timely appealed that decision. On March 24, 2006, the Nevada Supreme Court filed an order affirming the dismissal. Remittitur issued on April 25, 2006. Getz mailed his federal habeas petition to this Court on June 2, 2006. On June 20, 2006, the Federal Public Defender's office was appointed as Getz's counsel. Getz's counsel filed a first amended petition on January 31, 2007.

On December 14, 2007, this Court granted respondents' motion to dismiss, in part, finding that Ground Three of the petition was unexhausted. The Court gave Getz the option of abandoning his unexhausted claim and proceeding on his exhausted claims, or in the alternative, to seek a stay under *Rhines v. Weber*, 544 U.S. 269 (2005). Getz chose the latter. By order filed July 21, 2008, this Court granted Getz's motion for a stay, allowing Getz to return to state court to exhaust his unexhausted claim.

///

When Getz's further state-court proceedings concluded, Getz filed a motion to reopen this action. By order filed April 1, 2010, this Court granted Getz's motion to reopen the case. On April 28, 2010, Getz filed a second amended petition for writ of habeas corpus containing three (3) grounds for relief. Respondents filed a motion to dismiss Ground Three of the petition. On May 24, 2011, the Court entered an order granting the motion. Pursuant to this Court's order, both parties filed, on February 24, 2014, a supplemental brief addressing the impact of *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), on this Court's analysis of Ground Two.

## II. STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not "issue the writ simply because that court

///

1 concludes in its independent judgment that the relevant state-court decision applied
2 clearly established federal law erroneously or incorrectly." *Id.* at 411.

3     The Supreme Court has explained that "[a] federal court's collateral review of a
4 state-court decision must be consistent with the respect due state courts in our federal
5 system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a
6 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-
7 court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773
8 (2010) (*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*,
9 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks
10 merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on
11 the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786
12 (2011) (*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court
13 has emphasized "that even a strong case for relief does not mean the state court's
14 contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75
15 (2003)); *see also Cullen v. Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the
16 AEDPA standard as "a difficult to meet and highly deferential standard for evaluating
17 state-court rulings, which demands that state-court decisions be given the benefit of the
18 doubt") (internal quotation marks and citations omitted).

19     "[R]eview under § 2254(d)(1) is limited to the record that was before the state
20 court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398. In
21 *Pinholster*, the Court reasoned that the "backward-looking language" present in §
22 2254(d)(1) "requires an examination of the state-court decision at the time it was made,"
23 and, therefore, the record under review must be "limited to the record in existence at
24 that same time, i.e., the record before the state court." *Id.*

25     For any habeas claim that has not been adjudicated on the merits by the state
26 court, the federal court reviews the claim *de novo* without the deference usually
27 accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215,
28 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). *See also*

*James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting that federal court review is *de novo* where a state court does not reach the merits, but instead denies relief based on a procedural bar later held inadequate to foreclose federal habeas review). In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. *Pinholster*, 131 S.Ct at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable application of" limitations of 28 U.S.C. § 2254(d)(1). *Lockyer*, 538 U.S. at 71. In doing so, however, the court did not preclude such an approach. "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) – whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.*

### III. ANALYSIS OF CLAIMS

#### A. Ground One

In Ground One, Getz claims that he is in custody in violation of his constitutional rights because the trial court admitted statements that were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The statements in question were made by Getz to Las Vegas Police Officer Edward Shoemaker in the early morning hours of December 26, 1997. As factual support for this claim, Getz relies primarily on Shoemaker's testimony at trial.

That testimony described the relevant events as follows. At approximately 1:25 a.m., Getz, driving a red sports car, flashed his high beams at Shoemaker, whereupon Shoemaker pulled over and Getz pulled in behind him. (Dkt. no. 23, p. 19.)[1] Getz exited

///

---

[1] References to page numbers in the record are based on CM/ECF pagination.

his car quickly, approached Shoemaker, and stated, "I just killed somebody."[2] (*Id.*, p. 21.) Concerned for his safety, Shoemaker turned Getz around and put handcuffs on him, in response to which Getz indicated that he understood why Shoemaker did so. (*Id.*) In checking Getz's car for occupants, Shoemaker noticed a bullet hole in the left rear fender. (*Id.*, p. 22-23.)

After contacting dispatch, Shoemaker approached Getz and asked, "What do you mean you just killed somebody?" (*Id.*, p. 23.) Getz explained that he had gotten in a fight with someone, that there was a struggle, that a gun went off, and that he thought that the person was dead. (*Id.*) Shoemaker placed Getz in the front seat of the police car. (*Id.*) Needing more information to find out if someone needed medical help, Shoemaker asked additional questions about what had occurred. (*Id.*, p. 26.) Getz told Shoemaker that the victim was a gang member named Ray who had dated his daughter a couple of times. (*Id.*) He also told Shoemaker that he and the victim had made contact on the road and went to talk in a parking lot somewhere close to the airport where the struggle and shooting took place and that the victim was lying there injured or dead. (*Id.*, p. 27.)

Shoemaker contacted dispatch to find out whether anyone had been taken to the hospital with gunshot wounds or whether there had been any reports of shots fired in the vicinity of the airport. (*Id.*) Learning that no one had been brought to the hospital and still concerned that the victim may need medical help, Shoemaker called for his sergeant and detectives to come to the scene. (*Id.*) While Shoemaker waited for backup to arrive, Getz related more details about what had occurred. He told Shoemaker that Ray had confronted him in the parking lot and told him that he was going to continue to see his daughter and that anyone who tried to prevent it would end up dead. (*Id.*, p. 28.) He also told Shoemaker that Ray had pulled a gun on him, that the two struggled over

---

[2] As noted in the above excerpt from the Nevada Supreme Court's decision, evidence presented at trial established that, after the shooting, Getz drove home to change his clothes and then drove from Las Vegas to Arizona to dispose of the bloody clothes he wore during the shooting. These events occurred before Getz contacted Officer Shoemaker.

the gun, that two to four shots went off while they were standing, and that one more went off after they fell to the ground and Ray stopped moving, at which point he left the scene. (*Id.*, p. 28-30.)

After backup arrived, Shoemaker, with Getz still in the car and a detective following in a separate car, left to try to find the victim. (*Id.*, p. 33.) On the way, Shoemaker asked questions about the location and type of the gun. (*Id.*) Getz said he left it at the scene and that it was a .38 caliber. (*Id.*) Getz also elaborated on his story about the confrontation with the victim. Getz said that he was going to the store when someone who was following him (and turned out to be Ray) pulled up next to him from behind and told him, "We need to talk." (*Id.* p. 34.) At that point, according to what Getz told Shoemaker, they went to a parking lot with Getz intending to work out some kind of arrangement to keep Ray away from his daughter. (*Id.*)

After driving around for a period of time with Getz unable to direct Shoemaker to the exact location, Shoemaker stopped to explain to the detective why they had been driving around in circles. (*Id.*, p. 34-35.) At that point, Getz stood up and said that he thought the location was just up the road. (*Id.*, p. 35.) As they continued to drive, Getz was soon able to point out the location of Ray's car and the body, and, as they pulled into the parking lot, he commented that the gun was gone. (*Id.*, p. 35-36.) After quickly surveying the scene, Shoemaker asked Getz where the gun might be. (*Id.*, p. 38-39.) Getz said he did not know, but he said that there were people in another vehicle who he thought had watched the whole incident and may have taken the gun. (*Id.*, p. 39.)

Shoemaker asked Getz about the people in the other vehicle. (*Id.*) Getz told him that three or four people were in a car about 100 to 150 yards away who he noticed after hearing tires squeal as he stood up from the body. (*Id.*) He said that they drove off at that moment, but that he thought they may have come back to get the gun. (*Id.*) When asked by Shoemaker why he thought that, Getz said that he believed that they were Ray's friends or fellow gang members. (*Id.*)

According to Shoemaker, he and Getz were at the location where Getz had pulled him over for about 30 to 45 minutes, and the trip to the parking lot took about the same amount of time, making the total time they spent together about an hour and a half. (*Id.*, p. 39-40.)

Getz did not move to suppress his statements to the police or otherwise object to the admission of the statements at trial. He raised the issue on direct appeal, however, arguing that he was placed in custody when Shoemaker put handcuffs on him and that the trial court committed plain error by allowing testimony about what he had told the police prior to receiving a *Miranda* warning. (Dkt. no., p. 19-21.) The Nevada Supreme Court rejected the claim:

> We have held that when a defendant fails to specifically object to questions or testimony at trial, we will not consider an argument on appeal as a proper assignment of error. However, we may sua sponte address issues for the first time on appeal which involve plain error of constitutional dimension. To make this determination, we employ a balancing test where due process and public confidence in the judicial system is balanced against encouraging litigation on the relevant issues and discouraging silence during trial for tactical reasons, so that the losing party cannot get a second chance on appeal after a verdict has been rendered.
>
> Here, although a <u>Miranda</u> warning is a right of constitutional dimension, Getz failed to move to suppress or object to the admissibility of his statements either before or during trial. This appears to be a tactical decision, and for this reason alone, we conclude that Getz's argument fails.
>
> Moreover, the public safety exception to <u>Miranda</u> recognizes that the need for answers in situations that threaten public safety outweigh the need for the privilege against self-incrimination. Here Getz's statements were voluntarily made and questioning by police was related to public safety issues, such as the location of the shooting, the gun, and the victim; the nature of the events; and the extent of the victim's injuries.
>
> We conclude that Getz was not subject to custodial interrogation by police warranting a <u>Miranda</u> warning. Rather, Getz's statements were voluntary. Any interrogation by police was related to public safety concerns and, therefore, was admissible under the public safety exception to <u>Miranda</u>. . . .

Dkt. no. 32-4, p. 6-8 (footnotes omitted).

In sum, the Nevada Supreme Court rejected Getz's *Miranda* claim based on a finding that his decision to not raise the issue at trial was a tactical one, which

forecloses a conclusion that admission of the statements at issue constituted plain error, and, beyond that, admission of the statements was not erroneous because they were made voluntarily and subject to the public safety exception[3] to *Miranda*. The state court's decision was neither contrary to, or an unreasonable application of, clearly established federal law nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

To begin with, the Supreme Court has never held that a state trial court is required to *sua sponte* address *Miranda* issues in the absence of an objection by the defense. *See Carey v. Musladin*, 549 U.S. 70, 74 (2006) (holding that, where the Supreme Court has not addressed the legal question at issue, "it cannot be said that the state court unreasonably applied clearly established Federal law"). With respect to the public safety exception to *Miranda*, the Nevada Supreme Court correctly cited *New York v. Quarles*, 467 U.S. 649, 957 (1984), as the governing federal law on the issue. (Dkt. no. 32-4, p. 7.) The police questioning of Getz in the early morning hours of December 26, 1997, may have been investigatory in nature as to not fall within the "public safety" exception set out in *Quarles*, but "fair-minded jurists could disagree." *Yarborough*, 541 U.S. at 664.

Shoemaker's testimony was that Getz told him that he killed someone, but that Getz could not tell him for sure whether the victim was dead or alive. He also testified that, when he initially placed Getz in the car, he began asking questions to find out if someone was injured; that he checked with dispatch to find out whether anyone had been taken to the hospital with gunshot wounds; and that, once backup arrived, he asked his sergeant if he could go try to find the victim because he was concerned about the victim's safety. (Dkt. no. 23, pp. 26, 32-33.) Shoemaker also asked questions about the location and type of the gun, which Getz told him had been left at the scene. In

---

[3] The Nevada Supreme Court cited to *New York v. Quarles*, 467 U.S. 649, 657 (1984), wherein the Court held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." (Dkt. no. 32-4, p. 7.)

addition, he testified that Getz "volunteered almost everything that night," but that he (Shoemaker) "had to periodically ask questions to help understand because he was not telling me in sequence." (*Id.*, p. 44.) Based on Shoemaker's testimony, which was not refuted, a fair-minded jurist could conclude that Shoemaker's questioning of Getz was prompted by a reasonable concern for public safety.

Even if the admission of Getz's statements amounted to a violation of his Fifth Amendment privilege against self-incrimination, such admission was harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Pizzuto v. Arave*, 280 F.3d 949, 970 (2002) (applying harmless error analysis to a Fifth Amendment violation for using "uncounseled, non-Mirandized statements" against a defendant). Under *Brecht*, the reviewing court determines whether the error "had substantial and injurious effect or influence" on the proceedings. 507 U.S. at 623 (*quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Here, the fact that Getz shot Ware was never in dispute. Instead, the pivotal issue for the jury was the credibility of Getz's claim that Ware pulled a gun on him and was shot as the two wrestled.

Considering the excerpt from the Nevada Supreme Court's opinion set forth in Section I, above, only the part about Getz not being "entirely forthcoming to police about the night's events" would possibly be impacted by Getz's pre-*Miranda* statements. The remaining facts found by the Nevada Supreme Court, none of which have been refuted by Getz in this proceeding, show that Getz's self-defense claim was not credible, even after disregarding the statements at issue. If anything, Getz's testimony at trial about the night's events (dkt. no. 28, p. 35-58) was even more implausible than his statements to Officer Shoemaker on the morning of December 26. Thus, the trial court's admission of Getz's pre-*Miranda* statements did not have an appreciable impact on the jury's verdict. In fact, Officer Shoemaker's testimony regarding Getz's pre-*Miranda* statements are consistent with Getz's self-defense claim.

///

///

Because the state court's decision was neither contrary to, or an unreasonable application of, clearly established federal law nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, Getz is not entitled to habeas relief based on Ground One.

### B.     Ground Two

In Ground Two, Getz claims that his constitutional rights were violated because the trial court gave an improper instruction on premeditation and deliberation. According to Getz, the instruction was unconstitutional because it blurred the distinction between first and second degree murder and relieved the State of its burden of proof on an essential element of first degree murder. He also claims that, but for the improper instruction, there is a reasonable probability the jury would have returned a different verdict.

The instruction on "premeditation and deliberation" that Getz claims was defective read as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Dkt. no.31, p. 9.

The Nevada statutes define first degree murder, in relevant part, as a "willful, deliberate and premeditated killing." Nev. Rev. Stat. § 200.030(1)(a). The use of the challenged instruction was condoned by the Nevada Supreme Court in *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992), and is commonly referred to as the *Kazalyn* instruction. Eight years after *Kazalyn*, the Nevada Supreme Court ruled, in *Byford v. State*, 994 P.2d 700 (Nev. 2000), that the instruction was deficient because it defined only premeditation and failed to provide an independent definition for deliberation. See *Byford*, 994 P.2d at 713.

11

In *Babb v. Lozowsky*, the Ninth Circuit Court of Appeals gave an overview of the state and federal court jurisprudence involving the *Kazalyn* instruction. *Babb*, 719 F.3d at 1026-28. For the purposes of this case, suffice it to say that the Ninth Circuit's holding in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), regarding the constitutionality of the *Kazalyn* instruction is no longer good law in light of intervening Nevada Supreme Court decisions (*Babb*, 719 F.3d at 1029), but it is nonetheless a violation of due process to not use the new instructions announced in *Byford* in cases in which the conviction was not final at the time of the *Byford* decision (*Babb*, 719 F.3d at 1029).

In ruling upon Getz's challenge to the use of the *Kazalyn* instruction, the Nevada Supreme Court concluded as follows:

> . . . Getz cites to our holding in Byford in arguing that the district court's jury instruction regarding premeditation and deliberation as separate elements of first degree murder pursuant to Kazalyn v. State was prejudicial and impaired his due process rights. We disagree.
>
> However, we have expressly rejected this argument in Garner v. State by stating that the use of the Kazalyn instruction in trials that pre-date Byford does not constitute plain error. Here, as Getz's jury instruction was given on February 14, 2000, and our decision in Byford was published on February 28, 2000, the Kazalyn instruction in this case pre-dated the Byford opinion, and therefore, this argument fails. Moreover, Getz has failed to provide this court with a copy of any proposed alternative jury instruction; and therefore, the issue is not properly before this court on appeal.

Dkt. no. 32-4, p. 2-3 (footnotes omitted).

In *Nika v. State*, 198 P.3d 839 (2008), the Nevada Supreme Court determined that its decision in *Garner* was wrong in holding that the federal Constitution did not require application of the new rule in *Byford* to convictions that were not yet final at the time *Byford* was decided. *Nika*, 198 P.3d at 859. That holding does not factor into the AEDPA analysis, however, because it was premised on state, not federal, law. *Babb*, 719 F.3d at 1030 n. 6.

Even so, the state supreme court's rejection of Getz's claim runs afoul of clearly established federal law. In *Babb*, as in this case, the Nevada Supreme Court rejected the defendant's due process challenge to the *Kazalyn* instruction on the ground that the

*Byford* decision was issued after the defendant's trial. *Babb*, 719 F.3d at 1025. Relying on *Bunkley v. Florida*, 538 U.S. 835 (2003), the court in *Babb* concluded that, because the defendant's conviction had yet to become final when *Byford* was issued, "it was an unreasonable application of established federal law and a violation of Babb's due process rights for the Nevada court not to apply the change in *Byford*, which narrowed the category conduct that can be considered criminal, to her case." *Id.* at 1032. Given the factual similarity between the two cases, this Court is bound by the holding in *Babb* and, therefore, must conclude that the Nevada Supreme Court's rejection of Getz's claim is not subject to the deference required by § 2254(d).

Nonetheless, Getz is entitled to relief only if the constitutional error was not harmless. *See Babb*, 719 F.3d at 1033 (applying *Brecht* to the same constitutional error at issue in this case). "Generally, . . .when considering whether erroneous instructions constitute harmless error, courts ask whether it is reasonably probable that the jury would still have convicted the petitioner on the proper instructions." *Id.* at 1034 (citation omitted).

Under *Byford*, the jury would have been given the following instruction on deliberation:

> Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action.
>
> A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.

*Byford*, 994 p.2d at 714.

In his supplemental brief, Getz cites to other federal cases in which the court found in favor of the petitioner on the same issue – i.e., *Chambers v. McDaniel*, 549 F.3d 1191, 1200-01 (9th Cir. 2008); *Polk v. Sandoval*, 503 F.3d 903, 912-13 (9th Cir. 2007); *Elliot v. Williams*, 2011 WL 4436648, *7 (D. Nev. Sept. 23, 2011), aff'd, 545 Fed. Appx. 597 (9th Cir. Nov. 21, 2013); and *Kieren v. Nevada Atty. Gen.*, 2011 WL

5825629, *15-17 (D. Nev. Nov. 14, 2011), aff'd, ___ Fed. Appx. ___, 2014 WL 1202582 (9th Cir. Mar 25, 2014). (Dkt. no. 90, p. 4-13.) In *Polk*, the court found, as part of its harmless error analysis, that the evidence presented at trial "was not so great that it precluded a verdict of second-degree murder," the "State's evidence of deliberation was particularly weak," and that the court was "left 'in grave doubt' about whether the jury would have found deliberation on [the defendant's] part if it had been properly instructed." *Polk*, 503 F.3d at 912-13. The court in the other three cases reached the same conclusion. *Chambers*, 549 F.3d at 1200-01; *Eliot*, 2011 WL 4436648, *7; *Kieren*, 2011 WL 5825629, *15-16.

Getz argues that his case is similar to *Chambers*, *Polk*, and *Kieren*, because, as in those cases, the evidence "weighed in favor of a second degree murder committed in connection with a heated and violent confrontation on the heels of an emotional argument." (Dkt. no. 90, p. 9.) *Chambers* and *Kieren* are clearly distinguishable in that those cases involved undisputed evidence of a violent struggle between the defendant and the victim immediately prior to the killing. *See Chambers*, 549 F.3d at 1193 ("According to Chambers, Chacon initially stabbed Chambers with a knife, but Chambers got the knife away from Chacon. A struggle ensued, which resulted in Chacon's death."); *Kieren*, 2011 WL 5825629, *16 ("The shooting followed almost immediately upon what by all accounts was an extremely violent confrontation during which, *inter alia*, indisputably, Broyles bit off Kieren's right ear."). The only evidence of a violent struggle between Getz and his victim is Getz's statements to police, his testimony at trial, and the testimony of a defense forensic expert, all of which were substantially undermined by other evidence presented at trial. While the evidence in *Polk* did not establish a physical confrontation, the State presented testimony from a disinterested witness that he heard a loud argument shortly before he heard gunshots. *See Polk*, 503 F.3d at 905.

Even without convincing evidence of a heated argument or physical confrontation between Getz and Ware, however, the evidence presented at trial was not so great that

it precluded a verdict of second-degree murder. Getz's anger toward Ware, as well as the reason for it, was well-established, but there is no way to know, based on the evidence, whether that anger gave rise to a deliberate determination to kill or to a passionate confrontation that precipitated into a shooting. Also, the number of times that Ware was shot is not, in itself, necessarily indicative of deliberation. *Cf. Chambers*, 549 F.3d at 1200-01 (concluding that evidence "that Chambers stabbed Chacon seventeen times" and "that the wounds penetrated three inches into the body and were located in two separate clusters of wounds" did not demonstrate deliberation).

In this Court's view, the most incriminating evidence against Getz, in terms of establishing deliberation, is evidence that the gun used in the shooting was most likely his and that he was out driving in his daughter's car late on Christmas night for no plausible reason other than to confront Ware. Even so, the inferences that could be drawn from such evidence are no more demonstrative of Getz's state of mind than the inferences that could be drawn from the fact the petitioner in *Polk* "borrowed a bulletproof vest on the evening of the murder, which witnesses testified that he wore." *Polk*, 503 F.3d at 912. Respondents also point to Getz's threat to kill Ware on November 30 when Getz and his son went to Ware's apartment to find his daughter as evidence of deliberation. However, as the court in *Polk* observed, threats of killing "made more than a month before the incident that 'I' shoot you [,] I like to shoot people,'" do not compel a finding of deliberation. *Id.* at 912.

This Court agrees with the Nevada Supreme Court that Getz's actions after the shooting, but prior to contacting the police, undermine his claim of self-defense. Again, the Nevada Supreme Court recounted that immediately after the shooting, Getz drove home to change his clothes and then drove from Las Vegas to Arizona to dispose of the bloody clothes he wore during the shooting. He subsequently drove to downtown Las Vegas to flag down police officers to report the shooting and was unsuccessful in doing so until he encountered Shoemaker. The irrationality of those actions, particularly given Getz's background as a former private detective, however, suggest that Getz had not

considered beforehand a course of action and the consequences of shooting Ware. Thus, rather than support a finding of deliberation, the actions actually weigh against such a finding. Also, while the jury rejected Getz's claim of self-defense, the jury may not have necessarily rejected Getz's claim that the killing was the result of a confrontation. After all, Getz had learned about ten days before that Ware had impregnated his sixteen year old daughter. The jury may not have considered that Getz acted in the heat of passion or impulse because of the erroneous instruction.

Lastly, as occurred in *Polk*, the State "further blurred the line" between premeditation and deliberation in its closing arguments. *Polk*, 503 F.3d at 911-12. For example, as part of his rebuttal to Getz's closing argument, the prosecutor stated:

> [Defense counsel] tells you there's not enough here to show premeditation even if you don't believe Jack's story. Premeditation may be as instantaneous as successive thoughts of the mind. He tells you that the shot to the head, the fatal shot, was the last one. Is there time, instantaneous time, when firing four or five shots, even before the fifth shot, to form a premeditated determination to take a life?

Dkt. no. 30, p. 66.

The insufficient evidence of deliberation coupled with the State's closing arguments leave this Court in "grave doubt" as to the harmlessness of the erroneous instruction. *Babb*, 719 F.3d at 1033 (*quoting O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)). There is a "reasonable probability" that the trial court's use of the instruction "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Id.* (*quoting Brecht*, 507 U.S. at 623 (internal quotation marks omitted).

Because Getz is entitled to habeas relief based on Ground Two, his petition for habeas relief shall be granted.

It is therefore ordered that petitioner's second amended petition for writ of habeas corpus (dkt. no. 68) is granted, but stayed pending (1) the conclusion of any proceedings seeking appellate or *certiorari* review of the Court's judgment, if affirmed, or (2) the expiration of the time periods (including any court-authorized extensions) for seeking such appeal or review, whichever occurs later.

It is further ordered that petitioner shall be released from custody within thirty (30) days of the conclusion of the stay, unless the State files in this matter, within that thirty-day period, a written notice of election to retry petitioner and thereafter commences jury selection in the retrial within one hundred twenty (120) days following the filing of the notice of election to retry petitioner, subject to requests by either party for reasonable modification of the time periods.

It is further ordered that the Clerk of Court shall enter final judgment accordingly in favor of petitioner and against respondents, as provided above. The Clerk further shall provide a copy of this order and the judgment to the Clerk of Nevada's Eighth Judicial District Court, in connection with that court's case number 98-C149549.

It is further ordered that petitioner's motion for decision (dkt. no. 85) is denied as moot.

DATED THIS 28th day of March 2014.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE